IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LAURIE S. JENKINS<br><br>            Plaintiff,<br><br>     v.<br><br>UTAH COUNTY JAIL; UTAH COUNTY;<br>SCHRYVER MEDICAL; TODD<br>McALLISTER; ALAN HARRIS; VICKIE<br>NOSTROM; DALE BENCH; JOHN AND<br>JANE DOES 5-10; SCHRYVER DOE<br>INDIVIDUALS 11-15; and SCHRYVER<br>DOE SUPERVISORS 16-20.<br><br>            Defendant. | **MEMORANDUM<br>DECISION & ORDER**<br><br><br><br>Case No. 2:11-cv-00761<br><br>Judge Robert J. Shelby |

This case arises out of a ten-day delay in obtaining an x-ray procedure for an inmate whose hip was fractured while incarcerated at the Utah County Jail in March 2010.  The plaintiff, Laurie Jenkins, filed suit under § 1983, alleging Defendants acted with deliberate indifference to her medical needs in violation of the United States Constitution.  Ms. Jenkins seeks to recover against two municipal entities, a private medical contractor, and numerous individuals.

All of the parties move for summary judgment on liability.  For the reasons stated below, Plaintiff's Amended Motion for Partial Summary Judgment on Liability[1] is DENIED, Defendant Schryver Medical's Motion for Summary Judgment[2] is GRANTED, and Jail Defendants' Motion for Summary Judgment[3] is GRANTED IN PART and DENIED IN PART.

_____

[1] Dkt. No. 70.

[2] Dkt. No. 77.

[3] Dkt. No. 71.

## BACKGROUND

### I.    The Second Amended Complaint

Ms. Jenkins asserts three causes of action in her Second Amended Complaint: (1) Deliberate Indifference – Failure to Provide Proper Medical Care; (2) Deliberate Indifference – Inflicting Wanton and Unnecessary Pain; and (3) "*Monell*" Violations of the Eighth and Fourteenth Amendment.[4]  All of Ms. Jenkins's claims arise under 42 U.S.C. § 1983.

The Second Amended Complaint names several entities as defendants.  Defendants Utah County and Utah County Jail are named in an official capacity.  Defendant Schryver Medical, Inc., an independent contractor that provided limited medical services to inmates, was named as a defendant in its individual, official, and corporate capacity.

Ms. Jenkins also names numerous individual Defendants, including Todd McAllister, Alan Harris, Vickie Nostrom, Dale Bench, and Heidi Duke.  During the relevant time period, Mr. McAllister and Mr. Harris worked as nurses at the Utah County Jail.  Ms. Nostrom worked as an office specialist at the Utah County Jail.  Mr. Bench worked as Utah County Jail's Health Services Administrator.  Schryver employed Ms. Duke as a radiology technician.  Ms. Jenkins named these defendants in their individual and official capacities.[5]

### II.   Overview of the Three Motions

Ms. Jenkins moves for partial summary judgment under two theories.[6]  First, Ms. Jenkins argues that the failure to provide an x-ray until ten days after her first request for treatment constituted deliberate indifference in violation of the United States Constitution.  Second, Ms.

_____

[4] Dkt. No. 62.

[5] *Id.* at 3.

[6] Dkt. No. 70.

Jenkins argues that purported inadequacies in Utah County Jail's policies or procedures for providing x-ray services to inmates gives rise to liability under § 1983 as a matter of law.

Defendants Utah County, Nurse McAllister, Nurse Harris, Ms. Nostrom, and Mr. Bench ("Jail Defendants") move for summary judgment under five theories: (1) Utah County and official-capacity defendants cannot be liable under § 1983 because of the high standard for municipal liability; (2) Ms. Jenkins fails to show a causal link between Mr. Bench and her injury; (3) none of the Defendants acted with deliberate indifference; (4) qualified immunity immunizes the individual employees; and (5) the statute of limitations bars Ms. Jenkins's claims.[7]

Defendant Schryver also moves for summary judgment.[8]  Schryver maintains that it cannot be subject to liability under § 1983 because Schryver is a private medical contractor that did not act under color of state law when providing x-ray services to inmates at Utah County Jail. In the event the court finds that Schryver acted under color of state law, Schryver argues that it cannot be liable for three additional reasons: (1) Schryver was not responsible for a violation of Ms. Jenkins's constitutional rights; (2) Schryver was not subjectively aware of any risk of harm to Ms. Jenkins; and (3) Schryver's policies and employee training were not grossly negligent.

## III.    Factual Background

For the most part, the parties do not dispute the nature of Ms. Jenkins's injury, the date of the treatment, or the general timeline of events.  The court will first address the timeline of relevant events and then turn to the factual issues that remain in dispute.

---

[7] Dkt. No. 71.

[8] Dkt. No. 77.

### A.      Sequence of Events

The timeline of events is central to the required analysis.  Ms. Jenkins was injured and received treatment over a period of ten days in March 2010.  The events that culminated in this case began on March 21, when Ms. Jenkins was arrested and booked into Utah County Jail.

On March 22, Ms. Jenkins fell from the upper bunk in her cell and landed on her left side.  She reported her fall to a deputy, who in turn notified a nurse.  Later that morning, a nurse escorted Ms. Jenkins to an appointment with Dr. Keith Hooker, who examined Ms. Jenkins, prescribed 800 mg of Motrin, and instructed the clinical nurse, Nurse McAllister, to order an x-ray to "rule out a fracture."  Dr. Hooker did not request an emergency x-ray or transfer of Ms. Jenkins to the hospital.  At that time, Nurse McAllister did not notice anything distinctive about Ms. Jenkins's leg or hip or see any obvious medical injury.  Dr. Hooker did not provide Ms. Jenkins with crutches, and she walked to and from her cell and the clinic.  Shortly thereafter, Ms. Jenkins received Motrin.  Later that day, Nurse McAllister entered the x-ray order into the Jail's computer system, which in turn generated an x-ray order form.

On March 23, Ms. Nostrom, an office specialist who processes x-ray requests, came to work and discovered that Ms. Jenkins had not been x-rayed on March 22.  Ms. Nostrom faxed an order to Schryver, scheduling the x-ray for March 24.  That same day, Ms. Jenkins submitted a medical request form to Ryan Harris, who worked as a nurse in the Jail.[9]  To treat her pain and swelling, Nurse Harris provided Ms. Jenkins with a prescription dose of Motrin.  Nurse Harris

---

[9] Ms. Jenkins wrote in the request: "To look at my left leg / feel [sic] off top bunk still can't walk on."  Nurse Harris responded: "X-ray is scheduled."

also checked the computer system and confirmed that an x-ray was scheduled for March 24.  He

sent a written response to Ms. Jenkins reporting that her procedure had been scheduled.[10]

On March 24, Ms. Nostrom left the Jail for a personal appointment with her doctor.  She

did not return to work for approximately five days.  On that same day, Heidi Duke, a radiology

technician employed by Schryver, visited Utah County Jail and attempted to complete the x-ray

order for Ms. Jenkins.  But Ms. Duke was unable to conduct the x-ray because Ms. Jenkins was

"out to court" at the time of her visit.  Ms. Duke's log attributes the cancellation of the order to

Nurse McAllister.[11]

On March 26, Ms. Jenkins requested and received another medical request form.

Ms. Jenkins submitted a second medical request form on March 27.  Ms. Jenkins wrote:

"See Doc about Leg – X-ray???? / Nerve Pain / Nerve Spasems [sic]."  The form was returned to

Ms. Jenkins with a request for additional information.

On March 28, Ms. Jenkins resubmitted the form with additional information. She wrote,

"[F]eel [sic] off the Top Bunk first night I came in still haven't been checked hurt really bad you

[sic] guy is doing nothing about it."  The form was marked received on March 29.  The response

to the inmate request reads: "On the list for the Dr."[12]

Ms. Nostrom returned to the Jail on March 29, after four-and-a-half days of personal

leave.  She discovered an x-ray order on her desk.  Ms. Nostrom contacted Nurse McAllister to

discuss the order.  Although there is a dispute over whether Nurse McAllister contacted Schryver

to learn whether the x-ray had been completed, Ms. Nostrom's conversation with Nurse

---

[10] In his affidavit, Nurse Harris contends that (a) he had no reason to believe that the x-ray would not take place, (b) Ms. Jenkins never informed Nurse Harris of her court date, and (c) he believed she would receive adequate care.

[11] As discussed below, the parties dispute whether Nurse McAllister actually cancelled the x-ray.

[12] Dkt. 70-14.

McAllister led her to believe that the x-ray had been completed, and the Jail was awaiting the results.  Ms. Nostrom indicated this in the records by changing the order status to "completed."[13]

Ms. Nostrom purportedly refaxed the x-ray order to Schryver on March 30.

On March 31, Nurse McAllister, who typically does not conduct follow-ups on x-ray orders, viewed the physician's list, which indicated that Ms. Jenkins's procedure was still incomplete.[14]  He then investigated and confirmed the x-ray had not been taken.  The order was refaxed to Schryver.  That same day, Ms. Nostrom discovered that the x-ray had not yet been taken.  Ms. Nostrom encountered a technician sent by Schryver and inquired about the order.  The technician indicated that it was not on the list but agreed to conduct the procedure.  Ms. Nostrom watched the technician retrieve the machine and ensured the x-ray was taken.

Schryver's report, which was delivered later that day, showed a sub-capital femoral neck fracture to Ms. Jenkins's hip.  After receiving notice of the fracture, Dr. Hooker ordered that Ms. Jenkins be transported to the hospital for immediate treatment.

**B.    Internal Practices at Utah County Jail and Schryver**

In March 2010, the Utah County Jail's internal process for ordering a non-emergent x-ray involved three steps: (1) an employee input the order into an internal computer program; (2) an employee selected a particular date in the program; and (3) an employee printed out the order and faxed it to Schryver.  Once the order was submitted, Schryver would send a technician to

---

[13] Throughout the ten-days, Ms. Nostrom had no personal contact with Ms. Jenkins.

[14] Jail Defendants deny that Nurse McAllister heard any complaints or received any inmate medical request forms between March 23 and March 28.  Jail Defendants contend medical request forms would not typically be sent to a clinical nurse.

take the x-ray.[15]  Jail Defendants maintain they had never experienced a scheduling issue like the one with Ms. Jenkins's order prior to March 2010.

Schryver's view of internal practices and procedures differs slightly from the perspective proffered by Utah County Jail.  The parties do not dispute that Schryver's contract with Utah County Jail provided for routine x-ray procedures and STAT x-ray procedures.  A STAT x-ray must be called into Schryver and specifically identified.  According to Schryver, a regular x-ray order would typically be completed "if not the next day, the day after" the request.  In contrast to Jail Defendants, Schryver maintains that an x-ray order would be automatically cancelled if the inmate was in court, and that Utah County Jail was responsible for reordering the procedure if the inmate returned to the facility and the procedure was still necessary.

**C.      Policymakers**

At the time of these events, Mr. Bench acted as Health Services Director at Utah County Jail.  As part of his duties, Mr. Bench supervised Ms. Nostrom and also reviewed and revised policies and procedure for inmate health services.  Because he is not a licensed physician, Mr. Bench does not supervise physicians.  His responsibilities require him to understand whether there were any problems with the overall delivery of medical care at the Jail.  He had no personal involvement in Ms. Jenkins's treatment, and he first became aware of the lapse in her treatment after March 31.  The parties dispute whether Mr. Bench was a final policymaker, and whether Mr. Bench was aware of any deficiencies in physician care or nursing treatment.

James Tracy served as elected Sheriff of Utah County at the time of the incident.  Sheriff Tracy signs and approves all Jail policies.  He does not personally supervise administration of the

---

[15] The parties dispute the frequency with which Schryver technicians visited the jail.  Ms. Jenkins maintains Schryver visited every day, and Jail Defendants maintain visits occurred on Monday, Wednesday, and Friday.

Jail, the other defendants, or administration of medical care.  Sheriff Tracy had no personal

involvement with Ms. Jenkins.  The parties dispute whether Sheriff Tracy is Utah County's final

policymaker or is ultimately responsible for administration and management of the Jail.

### D.      CDs and Radiology Reports

Finally, the parties dispute whether Schryver left CDs containing x-rays at the Jail after

completing procedures, as well as the inference that should be drawn from the possibility that

CDs had been left in other cases.  Citing Ms. Duke's testimony, Ms. Jenkins argues that Schryver

was required to leave a CD for every completed x-ray before leaving the Jail.  But according to

Nurse McAllister, Schryver would not leave a CD in every case, and if there was an "abnormal

emergent finding," it would be communicated to a physician or clinical nurse on duty, which

would not necessarily be Nurse McAllister.  Moreover, Ms. Nostrom testified that receipt of a

final radiology report from Schryver signaled that the x-ray had been completed.

### E.      Significantly Disputed Events

The disputes in this case center mainly around three areas: (1) the dates on which Jail

Defendants sent orders to Schryver; (2) internal practices for cancelling x-ray procedures and the

effect of an inmate's court appearance; and (3) the employees' knowledge of both Ms. Jenkins's

pain and the status of the x-ray order during the relevant ten-day period.

#### 1.      Date of X-Ray Order

The parties dispute the exact dates that Jail employees ordered x-ray procedures for Ms.

Jenkins.  According to Jail Defendants, Nurse McAllister or another employee faxed the initial

order to Schryver on March 22, and Ms. Nostrom resent the order on March 23.  In support of

this theory, Jail Defendants provide testimony from employees and cite the print date listed on

the order form generated by the Jail's computer.  Ms. Jenkins, in contrast, contends that the date

listed on the order form was the date of its creation—not the date that Schryver actually received the form.  Accordingly to Ms. Jenkins, Schryver has no record of receiving an order until March 24, two days after the injury occurred.

A similar dispute surrounds the date Jail employees purportedly sent a second x-ray order to Schryver after Ms. Jenkins's missed her first appointment due to her court appearance.  Jail Defendants contend that an employee of Utah County Jail sent another x-ray order to Schryver on March 30.  Citing the fact that Schryver does not have any paper record of a March 30 order, Ms. Jenkins maintains that the final order was not sent until March 31.

The parties also dispute the significance that should be attached to language in the x-ray order sent to Schryver.  According to Jail Defendants, all orders were marked "today," even though they often would not be completed on the day they were sent.  In contrast, Ms. Jenkins maintains that the fact an order was marked "today" underscores its urgency.

### 2.    Effect of a Court Appearance

The parties dispute whether a court appearance on March 24 automatically cancelled Ms. Jenkins's procedure.  For example, if an inmate was unavailable due to a court appearance, Jail Defendants contend that the inmate's x-ray procedure would be automatically rescheduled or attempted until Schryver completed the order.  Jail Defendants also maintain that only physicians could cancel procedures.  In contrast, Ms. Jenkins and Schryver maintain that if a procedure did not occur, Utah County Jail was responsible for rescheduling or reordering the procedure if the x-ray was still necessary.

Similarly, the parties dispute whether Nurse McAllister cancelled the procedure on the date of Ms. Jenkins's court appearance.  Ms. Jenkins maintains that Nurse McAllister signed Ms.

Duke's log on March 24 and cancelled the procedure.  Nurse McAllister denies both of these allegations.

      3.    <u>Knowledge of Individual Defendants</u>

The undisputed facts show that neither Mr. Bench nor Sheriff Tracy had knowledge of Ms. Jenkins's injury or the missed x-ray appointment.  In their papers, the parties do not seriously dispute the knowledge of Ms. Duke or Nurse Harris.  Instead, the central dispute is the extent to which Ms. Nostrom or Nurse McAllister possessed knowledge of Ms. Jenkins's injury or suffering.

For example, the parties dispute whether Ms. Nostrom possessed knowledge of Ms. Jenkins's injury.  Ms. Nostrom submitted an affidavit denying personal knowledge of the injury, other than the need to get an x-ray scheduled.  Ms. Nostrom was also absent from the Jail from March 24 to March 29.  In response to Ms. Nostrum's absence, Ms. Jenkins contends that the initial x-ray order, the change on Ms. Nostrom's log, and her interactions with Nurse McAllister on March 29 suggest that Ms. Nostrum knew of Ms. Jenkins's pain and suffering.[16]

The parties dispute Nurse McAllister's state of mind in two significant respects.  First, Nurse McAllister denies being aware of any change in scheduling the procedure from March 22 to March 24.  He also denies knowledge of any missed appointments prior to March 31.  In response, Ms. Jenkins argues that there is evidence suggesting that Nurse McAllister cancelled the procedure on March 24.  According to Ms. Jenkins, Nurse McAllister also knew of the delay because Ms. Nostrom inquired about the status of the x-ray after returning to work on March 29.

---

[16] Ms. Jenkins also contends that Ms. Nostrom committed an error when she marked the x-ray "completed" prior to receiving a final report.  But Ms. Jenkins cites only to portions of deposition testimony that describe how orders are updated.

Second, although the parties agree that Nurse McAllister never received any inmate medical requests on March 23 or March 28, they dispute whether or not he understood that Ms. Jenkins was suffering as she awaited the x-ray.  Jail Defendants believe that Nurse McAllister could not and should not have been aware of the missed appointment because it would have been a common procedure for another on-duty nurse to learn the results of an x-ray.  In response, Ms. Jenkins argues that Jail employees should have been aware of the court appointment.

## ANALYSIS

### I.    Rule 56 Standard

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17]  "A material fact is one that might affect the outcome of the suit under the governing law, and a genuine issue is one for which the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[18]  When evaluating a motion for summary judgment, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[19]

In this case, the three motions for summary judgment raise five significant issues: (1) whether Schryver acted under color of state law by contracting to provide x-ray services to Utah County Jail; (2) whether Utah County, Utah County Jail, Schryver, or any official-capacity defendant may be liable under § 1983; (3) whether any of the individual Defendants are entitled to qualified immunity; (4) whether, as a matter of law, the undisputed facts demonstrate the individual Defendants possessed the requisite state of mind; and (5) whether Utah's statute of limitations bars Ms. Jenkins's claims.  The court will address each of these issues in turn.

_____

[17] Fed. R. Civ. P. 56(a).

[18] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citation omitted).

[19] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.    State Actor Analysis for Schryver

As a threshold matter, Schryver argues that it is entitled to summary judgment because an independent contractor who provides medical services to a jail, but lacks supervisory control over an inmate, does not act under color of state law, an element of liability under § 1983.

To act under color of state law, a defendant must have "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."[20]  A plaintiff may establish that a defendant acted under color of state law by proving the "defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment."[21] To do so, "the deprivation must be caused by the exercise of some right or privilege [and] the party charged with the deprivation must be a person who fairly may be said to be a state actor."[22] "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State."[23]

This principle is reflected in the holding of *West v. Atkins*.[24]  There, the Supreme Court held that a private physician under contract with the state to provide part-time medical services acted under color of state law "when undertaking his duties in treating [an inmate's] injury."[25] Notably, the Court rejected a contractual or supervisory theory of state authority.[26]  Instead, the Court concluded: "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can be fairly attributed to the State."  The

---

[20] *West v. Atkins*, 487 U.S. 42, 50 (U.S. 1988) (internal quotation marks and citation omitted).

[21] *Id.*

[22] *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 102 S. Ct. 2744, 2754 (1982)).

[23] *Id.*

[24] *Id.*

[25] *Id.* at 54.

[26] *Id.* at 53-54 ("*Estelle* . . . demonstrates that custodial and supervisory functions are irrelevant to an assessment whether the particular action challenged was performed under color of state law.").

defendant could be liable under § 1983, because he "worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment . . . to provide essential medical care to those the State had incarcerated."

Similar considerations apply to the contractor in this case.  Here, Schryver entered into a contractual relationship with Utah County.  By virtue of this relationship, Schryver received authorization to perform x-ray services on inmates, who in turn necessarily relied almost solely on Schryver to provide "adequate" radiological services.[27]  Although Utah County bore "an affirmative obligation" to provide medical care to inmates under the Eighth Amendment, its decision to delegate some portion of these responsibilities to Schryver, who in turn assumed the delegated portion of that obligation, clothed Schryver in state authority and made its conduct fairly attributable to Utah County.[28]  Accordingly, Schryver acted under color of state law insofar as it agreed to provide radiological services to inmates.

Schryver argues that *West* and similar cases are distinguishable because Schryver lacked control over Ms. Jenkins's treatment.  The court disagrees.  Schryver relies on cases that predate the Supreme Court's careful analysis of state action in an analogous context in *West*.[29]  There, the Court tacitly acknowledged that a contractor might be liable irrespective of whether it exercised control or custody over the inmate.[30]  The decision also reflected the principle that a restrictive legal standard, such as the one proposed by Schryver, would permit or even encourage state actors to contract services to third parties in order to avoid their constitutional obligations.

---

[27] *See id.* at 54-55.

[28] *See id.* at 55-57.

[29] *See* Dkt. No. 77, at 15-16 (discussing cases).

[30] *See West*, 487 U.S. at 53-54.

In other words, Schryver's proposed bright-line approach is a restrictive, inflexible standard inconsistent with existing case law.  Instead, the proper inquiry is whether Ms. Jenkins demonstrated that Schryver's provision of medical services was exercised by virtue of state authority such that defects in medical diagnosis are fairly attributable to state actors.  Ms. Jenkins made this showing.  Accordingly, Schryver is not entitled to summary judgment under § 1983 on the basis that it provided limited medical services to inmates as an independent contractor.

## III.   Municipal or Entity Liability

The parties dispute whether the official-capacity defendants and municipal entities are liable for Ms. Jenkins's injuries as matter of law.

### A.   Official-Capacity Defendants

Ms. Jenkins has named several entities and individuals as official-capacity defendants, including Utah County, Utah County Jail, Mr. Bench, Nurse McAllister, Ms. Nostrom, Nurse Harris, Schryver Medical, and John and Jane Does.[31]  Because Ms. Jenkins's official-capacity claims against the individual Defendants overlap with her claims against Utah County, Utah County Jail, and Schryver Medical, the court will briefly consider whether Ms. Jenkins properly seeks to hold the individual Defendants liable in their official capacity.

An official-capacity suit against an individual is essentially a suit against the entity that employs the individual.[32]  For this reason, federal courts often conclude that claims against both the individual and municipal entity are duplicative, redundant, and unnecessary.[33]  Practical

---

[31] *See infra* Analysis, Part V.C (discussing identification of Heidi Duke as a Jane Doe defendant).

[32] *Moss v. Kopp*, 559 F.3d 1155, 1168 n.13 (10th Cir. 2009).

[33] *Moore v. Bd. of Cnty. Comm'rs of Cnty. of Leavenworth*, 470 F. Supp. 2d 1237, 1255 (D. Kan. 2007), *aff'd*, 507 F.3d 1257 (10th Cir. 2007); *Vondrak v. City of Las Cruces*, No. CIV. 05-0172, 2009 WL 1300945 (D.N.M. Mar. 30, 2009) (citing Fed. R. Civ. P. 12(f)).

solutions to this problem include striking the official-capacity claims against individuals[34] or treating duplicative official-capacity claims against the individual and municipal employer as a single claim against the entity.[35]

In this case, the parties' briefing illustrates the confusion that often arises out of attempting to establish liability against both the entity and individual defendants in an official capacity.  For the purpose of clarity, the court will treat the official-capacity claims against the individual Defendants as claims against their respective employers.  Accordingly, the central issue raised by Ms. Jenkins's official-capacity claims at this stage is whether the undisputed facts prove that municipal or entity liability attached to Utah County, Utah County Jail, or Schryver.

### B.        Standard for Municipal or Entity Liability

Section 1983 does not impose liability on a municipality or entity merely because one of its employees violated another's constitutional rights while acting under color of state law.[36]  "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."[37]  A plaintiff seeking to impose liability on a municipal entity or government body must prove "(1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights."[38]  More recently, the Tenth Circuit articulated a third element for municipal liability: "state of mind."[39]

---

[34] *Id.*

[35] *Moss*, 559 F.3d at 1168-70 & n.13.

[36] *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983.").

[37] *Id.* (citation omitted).

[38] *Moss*, 559 F.3d at 1168.

[39] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

To satisfy the first element, a plaintiff must identify an official policy or custom, which may include "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision."[40]  The second element requires that the plaintiff demonstrate that the policy or practice was "closely related to the violation" or the "moving force" behind the injury.[41]  Finally, a plaintiff seeking to impose liability on a municipality for a facially lawful action "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[42]  A plaintiff satisfies this standard by demonstrating "the municipality had actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[43]

The Tenth Circuit has made two additional observations about municipal liability claims relevant to this court's analysis.  When evaluating whether the decision of a final policymaker gives rise to liability, "proof of a single incident of unconstitutional activity is ordinarily not sufficient" unless the plaintiff demonstrates "the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions."[44]  In a similar vein, liability arises out of a municipality's failure to train its employees only "where 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation

---

[40] *Id.* at 770.

[41] *Id.*; *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404-05 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

[42] *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407).

[43] *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (recognizing notice may be demonstrated by a pattern of conduct and, in narrow circumstances, when the potential violation is "highly predictable" or "plainly obvious").

[44] *Moss*, 559 F.3d at 1169; *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996).

of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been indifferent to the need.'"[45]

### 1. Utah County and Utah County Jail

In her opening brief, Ms. Jenkins argues that Utah County and Utah County Jail violated the Eighth Amendment by failing to adopt a policy that would ensure completion of every x-ray order for inmates. In subsequent filings, Ms. Jenkins expands on this theory by advancing other failures to act: (a) failure to have sufficient staff; (b) failure to adequately train employees; or (c) failure to create redundancies that would ensure that every x-ray was completed.

The court will assume for the purposes of its analysis that Ms. Jenkins has identified a policy or custom capable of supporting liability under § 1983.[46] But even assuming the existence of an otherwise actionable policy or custom, the court finds that summary judgment in favor of Utah County and Utah County Jail is warranted because Ms. Jenkins failed to demonstrate these municipal entities or their policymakers possessed the requisite state of mind. Here, neither Sheriff Tracy nor Mr. Bench possessed personal knowledge of Ms. Jenkins's injury at the time of the events giving rise to this case. More importantly, Ms. Jenkins failed to demonstrate that either official policymakers or the municipal entities possessed knowledge of similar incidents that could give rise to a need to adopt additional policies, hire additional staff, or conduct additional training. To the contrary, this appears to have been a tragic and unforeseen episode arising out of an unexpected series of events unlike anything that had happened before.

---

[45] *Schneider*, 717 F.3d at 773 (quoting *City of Canton*, 489 U.S. at 390).

[46] It is not clear whether each of Ms. Jenkins's theories rises to the level of a policy or custom. On the one hand, Ms. Jenkins appears to characterize the "official policy or custom" as a failure to adopt a policy or custom. But on the other hand, Ms. Jenkins appears to allege a failure to train claim. *See Schneider*, 717 F.3d at 780 n.10. Although Ms. Jenkins's legal theories raise interesting questions about the extent to which *City of Canton* stands for the broad proposition that failure to adopt a formal policy on a discrete issue may give rise to liability, the court does not reach the issue because Ms. Jenkins' cannot demonstrate the requisite state of mind.

In this respect, neither Utah County nor Utah County Jail had actual or constructive notice that failure to take additional steps relating to x-ray procedures would be "substantially certain to result in a constitutional violation."

In response, Ms. Jenkins appears to argue that the policy in this case was "obviously deficient or non-existent."[47] Yet, the risk of the particular harm in this case is not as obvious as Ms. Jenkins contends. Indeed, Jail Defendants adopted an internal procedure for an inmate who requested medical attention, contracted with a third party to provide radiological services, and transported injured inmates to a clinic on the date of an injury, where a physician would determine whether an emergency or regular x-ray procedure was appropriate. Unfortunately, unanticipated errors or miscommunication between Utah County Jail and Schryver exacerbated Ms. Jenkins's injury.[48] But it cannot be said that Utah County or Utah County Jail consciously or deliberately chose to disregard the risk of injury presented in this case.[49]

In concluding that no reasonable jury could find municipal liability in this case, the court is mindful of the principle that a single incident may, but often does not, form an appropriate basis for municipal liability.[50] Furthermore, the approach urged by Ms. Jenkins raises the question of liability anytime an injury could be attributed to the absence of a policy on a discrete

---

[47] Dkt. No. 96, at 36. Ms. Jenkins argues Ms. Duke's testimony demonstrates that Ms. Jenkins's court appearance presented a recurring situation. This argument is unpersuasive because neither Ms. Jenkins nor Ms. Duke provides any evidence of prior incidents of significantly delayed treatment that would make the need for a policy "plainly obvious." *Id.* at 36-37 (quoting *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003)).

[48] The fact of this miscommunication, the disparity between internal practices, and the role of individual employees raise serious questions as to whether Ms. Jenkins can demonstrate a causal nexus between an official policy and the harm. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405-06 (1997) (imposing "rigorous standards of culpability and causation" when the municipality did not directly inflict the injury). Because the court concludes that Ms. Jenkins cannot prove the requisite state of mind, it does not reach this issue.

[49] Insofar as Ms. Jenkins proceeds under a "failure to train" theory, the court concludes that Ms. Jenkins has not demonstrated that the "need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation . . . that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need for additional training." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (brackets in original).

[50] *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011).

issue, even though § 1983 was not intended to give courts the ability to micromanage

municipalities.[51]  In this respect, imposing municipal liability on Utah County and Utah County

Jail is inconsistent with the limiting principles set out in *Monell* and *City of Canton*.  For all of

the reasons above, Utah County and Utah County Jail are entitled to summary judgment.

> 2.  Schryver

It is not clear from the briefing whether the parties understood that the *Monell* standard

applies with equal force to Schryver if, as the court has concluded, Schryver acted under color of

state law.[52]  In any event, Schryver argues the court should grant summary judgment in its favor

because Ms. Jenkins cannot establish Schryver violated her rights.[53]  Accordingly, the court will

construe the arguments in the parties' briefing as directed at whether Ms. Jenkins satisfied the

elements for imposing § 1983 liability on Schryver as an entity subject to *Monell*.

After careful consideration, the court concludes that Ms. Jenkins failed to demonstrate the

requisite state of mind for imposing liability on Schryver.  Specifically, there is no evidence that

Schryver had actual or constructive notice that its policy or custom was "substantially certain" to

result in this type of injury, especially where Ms. Jenkins fails to proffer any specific evidence of

this type of error occurring prior to this incident.  Moreover, no reasonable jury could find

Schryver's internal practices at the time or its failure to adopt a more demanding company policy

caused a violation of Ms. Jenkins's rights under the Tenth Circuit's "rigorous" standard where, as

---

[51] *Id.* at 1363.

[52] *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1216 (10th Cir. 2003) ("Although the Supreme Court's interpretation of
§ 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law,
caselaw from this and other circuits has extended the *Monell* doctrine to private § 1983 defendants.").  While the
parties failed to brief the issue, the Amended Complaint appears to limit the claims against Schryver to the acts of its
employees, which raises serious questions as to whether Schryver would be entitled to summary judgment insofar as
Ms. Jenkins attempts to impose liability under a theory of vicarious liability.  Because the parties failed to brief this
issue, the court will analyze whether Schryver as an entity can be liable under § 1983.

[53] Dkt. No. 77.

here, Schryver's role in this case was limited to performing non-emergent x-rays on inmates in the custody and control of Utah County Jail at the direction of its employees.  In other words, Schryver's circumscribed role in the medical treatment of inmates, its inability to impose policies on Jail Defendants, and its limited access to Ms. Jenkins compel the conclusion that no jury could find the requisite causal nexus between Schryver's conduct and Ms. Jenkins's injury.[54]

Ms. Jenkins nevertheless maintains that Schryver's policies and training were deficient.[55] She argues that Schryver's employees testified that it was not uncommon for an inmate to be unavailable because of a court date.  In her view, this recurring situation required Schryver to adopt a clear policy, adequately train its employees, and coordinate with the Jail.  Ms. Jenkins theorizes these facts demonstrate "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [state actor] can reasonably be said to have been deliberately indifferent to the need."[56]

The court disagrees with Ms. Jenkins's broad application of *City of Canton*.  Subsequent cases have suggested that its reach is limited.[57]   While there may have been prior instances when an inmate's absence caused a temporary delay in completing a non-emergent x-ray, Ms. Jenkins has not supplied evidence that Schryver's internal practices or similar miscommunications had previously resulted in constitutional deprivations of adequate medical care.  While the standard for deliberate indifference does not require prior incidents or a pattern of violations in all cases, the need for additional policies or training was not "so obvious" under the facts of this case.

---

[54] *Cf. Minix v. Canarecci*, 597 F.3d 824, 832-33 (7th Cir. 2010).

[55] Ms. Jenkins's briefing focuses primarily on the knowledge or individual acts of Schryver's employees.  *Compare* Dkt. No. 80, at 14-18, *with id.* at 18-20.  As already discussed, § 1983 does not impose liability on entities for the acts of their employees.  *Dubbs*, 336 F.3d at 1216.

[56] Dkt. No. 80, at 19-20 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 396 (1989)).

[57] *Connick v. Thompson*, 131 S. Ct. 1350, 1364 (2011).

To the contrary, according to Schryver and Ms. Jenkins, Schryver adopted internal policies that placed on Jail employees the onus of ensuring that absent inmates later received x-rays if necessary.  Under this approach to the facts, Schryver cannot "reasonably be said to have been deliberately indifferent" to an obvious need.[58]  But even if Jail Defendants correctly assert that Schryver employees should have automatically returned to the Jail unless a physician cancelled the order, Schryver was, at most, perhaps negligent in not taking additional steps to communicate with Utah County Jail.[59]  Mere negligence is not enough to impose liability on an entity under § 1983, which was not intended to "provide plaintiffs or courts *carte blanche* to micromanage [entities] throughout the United States."[60]

In sum, because no reasonable jury could conclude that Schryver acted with deliberate indifference or adopted a policy or custom that bore a direct relationship to Ms. Jenkins's injury, Schryver is entitled to summary judgment.

## IV.    Qualified Immunity

The third issue is whether the individual employees are entitled to qualified immunity. According to Defendants, Ms. Jenkins's injuries resulted from a miscommunication between Utah County Jail and Schryver, and none of the employees had the requisite state of mind to impose liability under § 1983.   Ms. Jenkins disagrees, arguing that several of the employees acted with deliberate indifference to Ms. Jenkins's pain and suffering.[61]

---

[58] *City of Canton*, 489 U.S. at 396.

[59] Although not directly addressed by the parties, Ms. Jenkins did not proffer evidence that would permit the court to test the adequacy of the training program.  *See Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).  And as discussed above, liability may not be imposed on Schryver solely on the basis of the negligent acts of employees.

[60] *Connick*, 131 S. Ct. at 1363 (emphasis in original) ("[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").

[61] Ms. Jenkins appears to argue that a ten-day delay of medical treatment automatically constitutes deliberate indifference.  As discussed below, the court disagrees and concludes that the appropriate inquiry is whether each

A.        **Standard for Qualified Immunity**

Qualified immunity shields government officials performing discretionary functions when an implicated constitutional right is unclear or the officer performs reasonably in light of the constitutional context.[62]  Once qualified immunity has been invoked, a party seeking to impose individual liability on a state actor must satisfy a "strict two-part test."[63]  Specifically, a "plaintiff must establish (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct."[64]

For a right to be clearly established, it must be sufficiently clear that a reasonable officer would understand that the conduct constitutes a constitutional violation.[65]  "Ordinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains."[66]  Although a factually identical case is not required,[67] the existence of the right must be demonstrated under "the specific context of the case, not as a broad general proposition."[68]  The inquiry is objective, and the plaintiff bears the burden of identifying and citing the relevant authority.[69]

When considering whether a right has been violated at the summary judgment stage, a district court must "examine the facts . . . in the light most favorable to the plaintiff, to determine

---

individual defendant possessed the requisite state of mind for imposing liability given the circumstances.  *Accord. Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994) (noting that delay may constitute deliberate indifference).

[62] *Anderson v. Creighton*, 483 U.S. 665, 638 (1987).

[63] *Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010).

[64] *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (internal quotation marks and citation omitted).

[65] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010).

[66] *Thomas*, 607 F.3d at 669 (quoting *Medina v. City & Cnty. Of Denver*, 960 F.2d 1493 (10th Cir. 1992)).

[67] *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1118 (10th Cir. 2008).

[68] *Thomas*, 607 F.3d at 669; *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009).

[69] *Thomas*, 607 F.3d at 669.

whether they amount to a violation of a clearly-established right."[70]   In the Tenth Circuit, courts

are instructed to identify the facts relevant to the constitutional analysis and then to proceed to

analyze "whether those facts suffice to show a violation of law."[71]   This analysis should focus on

the acts or involvement of each individual defendant who invokes qualified immunity.[72]   "[T]o

overcome defendants' assertion of qualified immunity, plaintiffs . . . must establish that each

defendant . . . caused a violation of plaintiffs' clearly established constitutional rights, and that

each defendant acted with the constitutionally requisite state of mind."[73]

### B.   Clearly Established Right

Although courts often start the qualified immunity analysis by asking whether a right has

been violated, a district court may begin with the clearly established inquiry.[74]

In this case, Ms. Jenkins satisfied her burden of demonstrating the existence of a clearly

established right.  The Supreme Court and Tenth Circuit have recognized that a "prison official's

deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."[75]

More relevant to the facts of this case, the Tenth Circuit has held that a medical professional who

"knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other

personnel capable of treating the condition" may be liable under § 1983 "if he delays or refuses

to fulfill that gatekeeper role due to deliberate indifference."[76]   Stated differently, the Tenth

---

[70] *Dodds*, 614 F.3d at 1192.

[71] *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (discussing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)); *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 878 (10th Cir. 2014).

[72] *Pahls v. Thomas*, 718 F.3d 1210, 1225-31 (10th Cir. 2013) ("Liability under § 1983 . . . requires personal involvement.  Plaintiffs must establish that *each* defendant [caused a constitutional violation.]").

[73] *Id.* at 1228.

[74] *Pearson v. Callahan*, 555 U.S. 223 (2009).

[75] *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

[76] *Id.* at 1211.

Circuit recognizes "two types of conduct which may constitute deliberate indifference in a prison medical case: (1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition."[77]  By way of example, failure to respond to a gangrenous finger or heart attack symptoms in a timely manner may constitute a constitutional violation so long as the plaintiff demonstrates deliberate indifference.[78]

Given the Tenth Circuit case law on this point, Jail Defendants' argument that the right was not clearly established is unavailing.  Here, a reasonable employee of a jail in the Tenth Circuit would have understood that delaying access to medical diagnosis or treatment for a serious medical condition, such as a possible broken bone, may rise to the level of deliberate indifference and constitute a violation of the Eighth Amendment.  This is especially true where, as here, one or more employees are responsible for facilitating access to personnel capable of providing treatment ordered by a physician.  Tenth Circuit case law involving deliberate indifference and medical treatment in this context is not so general as to deprive reasonable employees of notice of their constitutional obligation.  Ms. Jenkins satisfied her burden of demonstrating a clearly established right in the context of this case.

## C.    Constitutional Violation

Although the Eighth Amendment imposes an obligation on prison officials to care for the medical needs of inmates, an inmate seeking to establish a constitutional violation under § 1983

---

[77] *Self v. Crum,* 439 F.3d 1227, 1231 (10th Cir. 2006) (describing cases); *see also Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005).

[78] *Self,* 439 F.3d at 1232; *see also Heidtke v. Corr. Corp. of Am.,* 489 F. App'x 275, 280 (10th Cir. 2012) (discussing circumstances under which a medical professional or prison official may be liable under § 1983 for deliberate indifference to an inmate's medical needs).

must present evidence of objective and subjective deliberate indifference.[79]  "The objective component is met if the deprivation is 'sufficiently serious.'"[80]  In the Tenth Circuit, a need for medical treatment is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[81]  In contrast, the subjective component is satisfied only "if a prison official knows of and disregards an excessive risk to inmate health or safety."[82]

The Tenth Circuit's decision in *Sealock v. Colorado* is instructive.  In *Sealock*, an inmate experiencing sweating, vomiting, chest pain, trouble breathing, and a pale appearance requested a correctional officer.[83]  Officer Nancy French responded and informed the inmate that she was unable to assist because there was no one in clinical services.  Sergeant Joseph Barrett then responded, at which point the inmate informed him that he believed he was having a heart attack.  Sergeant Barrett indicated that there was nothing he could do for the inmate and represented that "it would take an hour to get the van warmed up, and it was snowing outside."  Sergeant Barrett offered an antacid and reportedly stated, "Just don't die on my shift.  It's too much paper work."  Officer French returned, offered Tylenol, and informed the inmate that he could see a physician assistant at 6:00 a.m.  After the inmate arrived in the infirmary, he told Nurse Renee Huber that he had chest pain and could not breathe.  Nurse Huber recorded some but not all of the symptoms and conveyed them two hours later to Roy Havens, the physician assistant on duty.  P.A. Havens testified that he never learned of the chest pain and so he prescribed medication

---

[79] *Sealock*, 218 F.3d at 1209; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[80] *Farmer*, 511 U.S. at 834.

[81] *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).

[82] *Id.* (quoting *Hunt*, 199 F.3d at 1224).

[83] *Sealock*, 218 F.3d at 1207-08.

rather than contact an ambulance.  The inmate stayed in bed the rest of the day.  The next

afternoon, another physician assistant arrived, administered an EKG, and ordered an ambulance,

where the hospital determined the inmate had suffered a major heart attack.

The inmate sued Officer French, Sergeant Barrett, Nurse Huber, and P.A. Havens.  The

district court granted summary judgment in favor of the individual defendants on the basis of

qualified immunity.

The Tenth Circuit reversed summary judgment for Sergeant Barrett and P.A. Havens, but

affirmed summary judgment for Nurse Huber.[84]  Recognizing failure to provide access to

medical treatment or personnel capable of evaluating an injury may give rise to § 1983 liability

in certain circumstances, the Tenth Circuit framed the issue in terms of the official's knowledge

of "his role in a particular medical emergency" and whether the official "delays or refuses to

fulfill that gatekeeper role due to deliberate indifference."[85]

The Tenth Circuit held that Sergeant Barrett "knew of and disregarded" excessive risk

when he observed heart attack symptoms but refused to take the inmate to the hospital and

instructed him not to die on shift.[86]  Similarly, where P.A. Havens testified that standard

treatment for unexplained chest pain was to contact an ambulance, the court concluded it would

have been more than "mere 'malpractice' or 'negligence'" to fail to call the ambulance."[87]

Because P.A. Havens admitted that he had been told about the chest pain, his failure to contact

the ambulance constituted disregard of a substantial risk.  At the same time, however, the Tenth

---

[84] The Tenth Circuit affirmed summary judgment in favor of Officer French on procedural grounds.

[85] *Sealock*, 218 F.3d at 1211.

[86] *Id.* at 1210-11.

[87] *Id.* at 1211.

Circuit affirmed summary judgment for Nurse Huber, because "[a]t worst, she misdiagnosed appellant and failed to pass on information to P.A. Havens."[88]

More recently, the Tenth Circuit characterized the burden for demonstrating a culpable state of mind in this context as follows: "The [state of mind] may be demonstrated by a showing of [the state actor's] (a) conscious disregard of a substantial risk of serious harm arising from [the inmate's symptoms], or (b) actual knowledge of [the inmate's condition] and refusal to order further treatment."[89]  The court further cautioned that a "purely objective test for deliberate indifference is simply incompatible with the tenants of the Eighth Amendment."[90]

In this case, the court finds that Dr. Hooker's diagnosis of a possible hip fracture, his order for a diagnostic x-ray, and the pain and suffering accompanying delay in obtaining the x-ray and diagnosis satisfies the objective component of the deliberate indifference test.  The court will now consider each of the Jail employees individually and analyze whether Ms. Jenkins can satisfy the subjective component of the deliberate indifference inquiry.[91]

### 1.    Todd McAllister

The court will first identify the facts from which a reasonable jury could conclude that Nurse McAllister was deliberately indifferent to Ms. Jenkins's medical needs.  According to Ms. Jenkins, Nurse McAllister failed to order the x-ray in a timely manner.  Although the parties dispute the inferences that should be drawn from Ms. Jenkins's physical symptoms, Nurse McAllister possessed awareness of the injury, the clinic appointment, the x-ray order, and a ten-

---

[88] *Id.*; *see also Farmer v. Brennan*, 511 U.S. 825 (1994) (discussing deliberate indifference standard).

[89] *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006).

[90] *Id.* (internal quotation marks and citation omitted).  In *Self*, the Tenth Circuit held an inmate failed to demonstrate deliberate indifference when a physician provided treatment consistent with the symptoms presented, even though the physician misdiagnosed the patient.

[91] Schryver does not invoke qualified immunity for Ms. Duke in its papers.

day delay in completing the procedure.  While Nurse McAllister insists that either he or another

Jail employee faxed the order to Schryver shortly after the clinic appointment, Schryver's

records suggest it first received a faxed order for Ms. Jenkins on March 24, with a second order

on March 31.  There is at least some evidence or testimony that Nurse McAllister may have

cancelled the procedure on March 24.  Finally, setting explanations aside, Nurse McAllister did

not check or follow-up on the status of the order until at least March 29.

By presenting this evidence, Ms. Jenkins satisfied her burden of demonstrating a right

was violated at least for the purposes of the qualified immunity analysis.  A reasonable jury could

find that Nurse McAllister knew of an excessive risk to Ms. Jenkins's safety because he

interacted with Ms. Jenkins, participated in the clinic appointment, possessed knowledge of the

possibility of a fracture, knew an x-ray had been ordered, and received an inquiry about the

procedure five days after the initial clinic appointment.  Similarly, a jury could conclude Nurse

McAllister, as the gatekeeper responsible for submitting the initial order on March 23,

disregarded an excessive risk by (a) failing to timely order the x-ray, (b) cancelling the procedure

on March 24, or (c) failing to ensure Schryver completed the x-ray after receiving some notice

that the order remained outstanding days after the initial appointment.  In this respect, Nurse

McAllister is analogous to Sergeant Barrett or P.A. Havens in the *Sealock* decision, where

qualified immunity was denied to jail personnel with knowledge of an inmate's potentially

serious medical condition and there was significant delay in providing treatment to the inmate.

For all of the reasons above, a reasonable jury could find Nurse McAllister's failure to

respond actively or effectively on several occasions throughout a ten-day period constituted

deliberate indifference.  Because Ms. Jenkins presented sufficient evidence of a constitutional

violation, Nurse McAllister is not entitled to qualified immunity.

2.    <u>Vickie Nostrom</u>

The court next identifies the facts relevant to Ms. Nostrom's claim of qualified immunity. Ms. Nostrom testified she was responsible for scheduling x-ray procedures.  Ms. Nostrom knew that a physician had ordered an x-ray for Ms. Jenkins's hip.  Although the hip injury occurred on March 22, Ms. Nostrom scheduled the procedure for March 24.  In doing so, Ms. Nostrom either failed to verify or ignored a court appearance scheduled on March 24.  Along a similar vein, there is evidence that Schryver's practice was to automatically cancel an order when an inmate was out for court.  Schryver maintains that Jail employees must resubmit an x-ray order after any cancellation.  Ms. Nostrom found an order form for an x-ray for Ms. Jenkins on her chair five days after March 24.  The form did not indicate whether the procedure had been completed.  Ms. Nostrom testified that she ordinarily learned whether Schryver completed a procedure when she received a faxed radiologist report from Schryver.  Despite this testimony and Ms. Jenkins's court date, Ms. Nostrom's initial response after returning to work on March 29 was limited to asking Nurse McAllister about the status of the procedure.  She ordered another x-ray on March 30 or March 31.  When Ms. Nostrom learned Schryver had not received the renewed order on March 31, she took additional steps to ensure that a Schryver technician completed the x-ray that day.

After careful consideration of these facts, the court concludes that Ms. Jenkins provided sufficient evidence for a jury to find that Ms. Nostrom possessed the requisite state of mind to establish a constitutional violation.  Although Ms. Nostrom lacked medical training or any personal interaction with Ms. Jenkins, internal records demonstrate that Ms. Nostrom knew that a physician ordered an x-ray for Ms. Jenkins.  A reasonable jury could find that Ms. Nostrum acted as the gatekeeper to radiological services by virtue of her responsibilities at the Jail.  Although

the evidence is largely circumstantial, a reasonable jury could conclude Ms. Nostrom disregarded an excessive risk of harm when she scheduled the procedure on March 24 but failed to verify whether Ms. Jenkins would be in court on that date.

Moreover, there is no evidence before the court that Ms. Nostrum made arrangements for anyone at the Jail to follow-up on Ms. Jenkins's procedure during her personal absence. This supports an inference that Ms. Nostrum failed to notify another employee about the x-ray order during an extended absence. In this respect, a reasonable jury could find that Ms. Nostrum's failure to take adequate steps to ensure the completion of x-rays during her absence reflects a conscious disregard of a significant risk of harm to Ms. Jenkins.

Finally, Ms. Nostrom failed to verify the status of Ms. Jenkins's procedure after returning to work on March 29. Because Ms. Nostrom did not find a final report when she returned to her office after an extended absence, the evidence supports at least an inference that Ms. Nostrom should have done more to investigate, prioritize, or expedite Ms. Jenkins's care. A jury could also draw an inference of deliberate indifference where, as here, Ms. Jenkins did not receive an x-ray until March 31, two days after Ms. Nostrom returned to work and ten days after the injury. For all these reasons, a jury could find Ms. Nostrom knew of and disregarded an excessive risk to Ms. Jenkins's health and safety in violation of the Eighth Amendment.

In response, Jail Defendants argue Ms. Nostrom was not deliberately indifferent because she never interacted with Ms. Jenkins and lacked personal knowledge of her medical condition. The court disagrees. Although Ms. Nostrom's liability is a close case, Ms. Nostrom was the Jail's primary gatekeeper for radiological services. In this respect, her involvement is analogous to P.A. Havens in the Tenth Circuit's *Sealock* decision.[92] Although Ms. Nostrom is not a medical

---

[92] *Sealock*, 218 F.3d at 1210-11.

professional, she was aware of the fact that a physician had ordered an x-ray.  Similar to P.A. Havens, ignoring a communication that reflected the need for treatment and delaying the procedure "arguably constitute[d] deliberate indifference to a serious medical need."[93]

In sum, a reasonable jury could find that Ms. Nostrum possessed the requisite state of mind to establish a constitutional violation, and she is not entitled to qualified immunity.

### 3.   Alan Harris

The facts relevant to Nurse Harris's invocation of qualified immunity are as follows. Nurse Harris encountered Ms. Jenkins on March 23.  He observed Ms. Jenkins walking with a limp.  Ms. Jenkins approached Nurse Harris and informed him that she had fallen from her bunk, her hip hurt, and that an x-ray had been ordered.  Nurse Harris responded by telling Ms. Jenkins: "It probably isn't broken because you're walking on it, but . . . the only way to know for sure is to do the x-ray and I'll go check and make sure and find out why the x-ray didn't happen."[94]  He also received a medical request form from Ms. Jenkins, checked the computer to verify that an x-ray had been scheduled, and returned the medical request form the following day.  Nurse Harris testified that he had no reason to believe that the x-ray would not take place.  He provided Ms. Jenkins with medication on March 26, but she did not again mention the x-ray procedure.[95]

The court concludes that Ms. Jenkins failed to demonstrate that Nurse Harris possessed the requisite state of mind for a violation of her rights under the Eighth Amendment.  In contrast to Ms. Nostrom and Nurse McAllister, Nurse Harris's role in treatment and his knowledge of the x-ray order were limited.  In this respect, the Tenth Circuit's decision to affirm summary judgment in favor of Nurse Huber in the *Sealock* decision is persuasive.  Both Nurse Huber and

---

[93] *Id.* at 1212.

[94] Dkt. No. 70-20, at 2.

[95] Dkt. No. 96-2, at 6.

Nurse Harris had limited interactions with an inmate.  Conceivably, both nurses may have

negligently misdiagnosed symptoms.  But both defendants took steps to ensure the person

responsible for treatment would be aware of the inmate's need for medical attention.  In this case,

Nurse Harris responded to the treatment request by providing medication and investigating

whether the x-ray procedure had been scheduled.  Given his limited role, no reasonable jury

could conclude that his response rose to the level of deliberate indifference, which requires more

than mere negligence.[96]  Accordingly, Nurse Harris is entitled to qualified immunity.

    4.    <u>Dale Bench</u>

In her papers, Ms. Jenkins waived her claim for supervisor liability against Mr. Bench.[97]

During the hearing, Ms. Jenkins conceded that the claims against Mr. Bench were limited to his

official capacity.[98]  Because official-capacity defendants are not entitled to qualified immunity,

the court will not consider whether qualified immunity extends to Mr. Bench.[99]

**V.    Summary Judgment on Deliberate Indifference**

Jail Defendants, Schryver, and Ms. Jenkins all move for summary judgment on liability.

In their respective motions, the parties argue that the material facts are undisputed and the court

should determine whether there was deliberate indifference as a matter of law.

Jail Defendants and Schryver argue the court should grant summary judgment in their

favor because neither the entities nor individual employees acted with deliberate indifference.

---

[96] *See Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006) ("In the end, the 'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'").  In *Self*, the Tenth Circuit observed that when an individual provides "a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.*

[97] Dkt. No. 96, at 53-54.

[98] *Id.* at 55-56; *see also* Dkt. No. 85, at 49-59 (analyzing Nurse McAllister, Ms. Nostrom, and Nurse Harris as individual defendants).

[99] Furthermore, as stated above, the court concluded that Ms. Jenkins's official-capacity claims fail.  *Supra* Analysis, Part III.

In contrast, Ms. Jenkins moves for summary judgment on liability under two theories. Ms. Jenkins first theorizes that a ten-day delay in obtaining an x-ray procedure constitutes per se deliberate indifference and results in general liability for Jail Defendants.  Next, Ms. Jenkins argues Jail Defendants exhibited deliberate indifference: (1) by delaying the x-ray between March 22 and March 24; (2) by cancelling the x-ray on March 24; (3) by failing to re-order the x-ray between March 24 and March 28; and (4) by delaying the procedure between March 29 and March 31.  In her papers, Ms. Jenkins does not distinguish between individual Defendants, but instead requests summary judgment against all Jail Defendants.

As an initial matter, Ms. Jenkins's suggestion that a ten-day delay constitutes deliberate indifference as a matter of law does not square with the case law or legal standard that this court is required to apply.  To the contrary, courts consider whether the subjective component of the deliberate indifference standard has been satisfied for each defendant based on the individual's role and the facts known by each at the time of the conduct.[100]  For this reason, the court rejects Ms. Jenkins's blanket argument that a ten-day delay automatically results in general liability for Jail Defendants.  Instead, the issue this court must consider is whether each employee acted with deliberate indifference in his or her interactions with Ms. Jenkins.  With this standard in mind, the court will consider the potential liability of the remaining individual Defendants: Nurse McAllister, Ms. Nostrom, and Ms. Duke.

---

[100] *Pahls v. Thomas*, 718 F.3d 1210, 1225-31 (10th Cir. 2013); *see, e.g., Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  Similarly, the court rejects Ms. Jenkins's reliance on an inapposite Seventh Circuit decision and her invitation to treat the individual defendants as a collective group when determining liability.  *Compare Pahls*, 718 F.3d at 1231, *with* Dkt. No. 96, at 50-52 (citing *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985)).

A.      Todd McAllister

As discussed above,[101] Ms. Jenkins presented sufficient facts for a reasonable jury to find that Nurse McAllister acted with deliberate indifference to a serious medication condition.  For this reason, Jail Defendants' argument that Nurse McAllister cannot be liable under § 1983 as a matter of law is unpersuasive and the court cannot grant summary judgment in his favor.

Relying on many of the same facts detailed in the court's qualified immunity analysis above, Ms. Jenkins argues the court should grant summary judgment in her favor.  However, genuine issues of material fact preclude summary judgment on Nurse McAllister's liability.  A reasonable jury could find Nurse McAllister reasonably attempted to respond to medical needs based on his understanding at the time of the conduct, or at worst acted negligently.  For example, Jail Defendants maintain that Nurse McAllister or an unidentified Jail employee submitted the initial order shortly after the clinic appointment.  Nurse McAllister denies cancelling the order and testified that he believed it would remain open until cancelled by a physician.

Similarly, Nurse McAllister testified that he contacted Schryver after Ms. Nostrom returned to the office and was told that Schryver was in the process of evaluating Ms. Jenkin's x-ray.  Nurse McAllister also testified he could assume the procedure had been completed because another nurse on duty may have received the results and Nurse McAllister was assigned to the clinic.  Finally, the parties dispute the appropriate inferences to be drawn from Ms. Jenkins's visible appearance, her ability to walk without crutches, Dr. Hooker's diagnosis, the frequency with which Schryver left CDs containing x-rays at the Jail after completing procedures, and the fact that Dr. Hooker ordered a regular, as opposed to emergent, x-ray procedure.

---

[101] *Supra* Analysis, Part IV.C.1.

Resolution of these disputed facts is central to understanding Nurse McAllister's state of mind and the reasonableness of his conduct.  And because a reasonable jury could find Nurse McAllister was or was not deliberately indifferent based on the resolution of these factual issues, the court can grant summary judgment to neither Ms. Jenkins nor the Jail Defendants.

**B.     Vickie Nostrom**

Similarly, genuine issues of material fact preclude summary judgment on Ms. Nostrom's liability.  As discussed above, the parties dispute which interpretation of internal practices for cancelling and rescheduling x-ray orders is correct.  This conflicting account of the practice at the time of Ms. Jenkins's injury, taken together with competing inferences from the initial order, clinical notes, and delays in treatment, bear directly on Ms. Nostrom's state of mind at the time of her conduct.  In particular, Ms. Nostrom testified she never experienced prior issues with scheduling and that she reasonably relied on Nurse McAllister's representations about the status of the x-ray when she returned to work on March 29.

Based on the resolution of these disputed facts, a reasonable jury could conclude that Ms. Nostrom behaved reasonably in light of the information available, acted only negligently by not taking additional steps after returning to work, or failed to adequately perform her constitutional obligation as a gatekeeper to medical services for an inmate.  Indeed, a reasonable jury could determine that Ms. Nostrom was deliberately indifferent to an excessive risk to Ms. Jenkins, or was merely negligent in performing her duties.  Because there remain genuine issues of material fact, the cross-motions for summary judgment on Ms. Nostrom's liability are denied.

C.      **Heidi Duke**

Schryver originally moved for summary judgment on liability.[102]  In her opposition to that motion, Ms. Jenkins identified for the first time Ms. Duke as a Jane Doe defendant and argued that her personal involvement gave rise to liability.[103]  Schryver responded by arguing that Ms. Duke's conduct was not deliberately indifferent.[104]  Because both parties invited inquiry into whether the Ms. Duke acted with deliberate indifference, the court construes Schryver's motion as seeking summary judgment on Ms. Duke's liability.  Here, the undisputed facts show that no reasonable jury could find Ms. Duke was deliberately indifferent.

The facts demonstrate, at best, that Ms. Duke acted reasonably or negligently.  Unlike Jail employees, Ms. Duke's ability to affect Ms. Jenkins's treatment or schedule was limited by virtue of her status as a technician employed by a private contractor.  Relevant to the claim here, Ms. Duke visited Utah County Jail once, but she never came into contact with Ms. Jenkins because of the court appearance.  On its face, there is nothing in this scenario that would permit a reasonable jury to conclude that Ms. Duke knew of and disregarded an excessive risk to Ms. Jenkins.  Moreover, to the extent that Schryver and Ms. Jenkins agree on internal practices at Schryver and the Utah County Jail, no reasonable jury could find Ms. Duke acted unreasonably or was otherwise deliberately indifferent when she followed Schryver's internal practices for non-emergent procedures.  Here, the evidence is that Ms. Duke learned she would be unable to

---

[102] Dkt. No. 77.

[103] Dkt. No. 80, at 2, 4-5.

[104] Dkt. No. 81, at 7-8.

complete the procedure, contacted dispatch, indicated a court date prevented her from completing the procedure, and left Utah County Jail.[105]

Ms. Jenkins, however, insists that Ms. Duke acted with deliberate indifference insofar as she may have cancelled the procedure, contrary to Utah County Jail's internal practices. Ms. Jenkins argues that a dispute over the governing internal practices precludes summary judgment on Ms. Duke's liability. The court disagrees. Even if Ms. Duke improperly cancelled the procedure based on her understanding at the time, her limited role and knowledge of internal Jail procedures suggests that a reasonable jury could, at best, find negligence.[106] Indeed, given Ms. Duke's unrebutted testimony concerning her expectations and past experience, there is nothing about her conduct or behavior that could support a finding that Ms. Duke, given her limited role, consciously disregarded an excessive risk to Ms. Jenkins's health or safety. Accordingly, Ms. Duke is entitled to summary judgment.

## VI.   Statute of Limitations

The final issue presented by the parties is whether Utah's two-year statute of limitations and the notice provision of the Utah Governmental Immunity Act bar Ms. Jenkins's claims.

Federal courts apply a forum state's statute of limitation to § 1983 claims.[107] In this district, courts have historically applied Utah's four-year statute of limitation.[108] Courts have

---

[105] *Cf. Heidtke v. Corr. Corp. of Am.*, 489 F. App'x 275, 284 (10th Cir. 2012) (suggesting inference of deliberate indifference is inappropriate where physician responded reasonably to perceivable risk).

[106] *Self v. Crum*, 439 F.3d 1227, 1235 (10th Cir. 2006) ("[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."); *see also Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010) (concluding medical contractor was entitled to summary judgment because theorizing that contractor should have been aware constituted negligence, rather than deliberate indifference).

[107] *See Wilson v. Garcia*, 471 U.S. 261, 275 (1985) (applying statute for personal injury action).

[108] *Loard v. Sorenson*, 2014 WL 1364678 (10th Cir. Apr. 8, 2014) (assuming without discussion that four-year statute of limitations applied); *Arnold v. Duchesne Cnty.*, 26 F.3d 982, 987 (10th Cir. 1994) (rejecting application of two-year statute of limitation); *Kerkhoff v. Ausenbaugh*, 2014 WL 1125591 (D. Utah Mar. 20, 2014); (assuming without discussion that four-year statute of limitations applied); *Larson v. Snow Coll.*, 189 F. Supp. 2d 1286, 1298 (D. Utah

recognized that § 1983 may preempt application of a restrictive statute of limitations or a notice of claim provision, particularly when its operation conflicts with the purpose and effect of the federal statute and produces inconsistent outcomes.[109]  For example, in *Four Star Ranch, Inc. v. Cooper*[110] and *Hatch v. Boulder Town Council*,[111] the district courts held the notice provision in the Utah Governmental Immunity Act does not apply to claims arising under § 1983.

After considering the relevant legal authorities, the court concludes that Utah's four-year statute of limitation applies to Ms. Jenkins's claims.[112]  Jail Defendants appear to argue that Utah intended for a restrictive, two-year limitation period to apply to claims arising under § 1983.[113] In *Maddocks v. Salt Lake City Corp.*, the Utah Supreme Court held that a general four-year statute of limitation applied to § 1983 claims against individual officers, and in doing so, rejected the argument that the court should apply a two-year statute of limitation substantially similar to the one cited by Jail Defendants.[114]  This would appear to foreclose the argument that a Utah court would construe Utah Code § 78B-2-304(1), -(4) as extending to § 1983 claims.

But even more importantly, the court concludes that the reasoning of *Arnold v. Duchesne County* is controlling.[115]  In *Arnold*, the Tenth Circuit held that a two-year statute of limitations

---

2000) (concluding amended two-year statute should not apply because it contravened the federal purpose of Section 1983); *cf. Adamson v. City of Provo*, Utah, 819 F. Supp. 934, 943 (D. Utah 1993) (analyzing prior two-year statute of limitations).

[109] *Felder v. Casey*, 487 U.S. 131, 138 (1988) (concluding 120-day notice requirement conflicted with the purpose and effect of § 1983 and produced inconsistent outcomes).

[110] 2010 WL 3489567 (D. Utah Sept. 2, 2010).

[111] 2007 WL 2985001 (D. Utah Oct. 10, 2007), *aff'd*, 2009 WL 82699 (10th Cir. Jan. 14, 2009).

[112] *See* Utah Code Ann. § 78B-2-307(3).

[113] Utah Code Ann. § 78B-2-304(1).

[114] *Maddocks v. Salt Lake City Corp.*, 740 P.2d 1337, 1339 (Utah 1987).  Notably, the Utah Supreme Court's analysis did not reach the validity of a recent amendment which applied specifically to § 1983 claims.  *Id.* at 1339 n.1.

[115] *Arnold v. Duchesne Cnty.*, 26 F.3d 982, 986 (10th Cir. 1994); *cf. Adamson v. City of Provo, Utah*, 819 F. Supp. 934, 942 (D. Utah 1993).

directed expressly at § 1983 claims was inconsistent with federal law and policy.  In subsequent cases, this district and the Tenth Circuit have applied Utah's four-year residual statute of limitation to § 1983 claims.[116]   This is especially warranted in this case, where application of a two-year statute of limitation would deter civil rights suits, extend extra protection to officers in a manner inconsistent with federal law, and disrupt neutral rules of decision.  In addition, Jail Defendants' approach would increase unpredictability and inconsistency by imposing a shorter period for bringing claims for personal injuries against state actors but not others.  This result is hardly consistent with the "purpose and nature" of § 1983.  For all these reasons, the court finds that Utah's four-year statute of limitations applies to Ms. Jenkins's claims.  Because the case was filed within this period, Ms. Jenkins's claims are not barred by the statute of limitations.

The court further finds that the Utah Governmental Immunity Act's notice provision does not apply to this suit.  Because state statutes conferring general immunity do not apply to federal cases arising under § 1983, the Utah Governmental Immunity Act's notice provision does not operate as a bar to the claims in this case.[117]   Even if a state could confer additional immunity on officers, the court would conclude that § 1983 preempts the notice provision because it is not "a neutral and uniformly applicable rule of procedure" but instead upsets "only . . . those who seek redress for injuries resulting from the use or misuse of governmental authority."[118]

---

[116] *Supra* note 108.

[117] *Four Star Ranch, Inc. v. Cooper*, 2010 WL 3489567, at *3 (D. Utah Sept. 2, 2010).

[118] *See Felder v. Casey*, 487 U.S. 131, 138 (1988) ("Because the notice-of-claim statute at issue here conflicts in both its purpose and effects with the remedial objectives of § 1983, and because its enforcement in such actions will frequently and predictably produce different outcomes . . . we conclude that the state law is pre-empted when the § 1983 action is brought in a state court").

Accordingly, Jail Defendants are not entitled to summary judgment because of the Utah Governmental Immunity Act or Utah's two-year statute of limitations.[119]

## CONCLUSION

The court concludes that Ms. Jenkins failed to establish a basis for municipal liability as a matter of law.  With respect to the individual Defendants, while qualified immunity bars the suit against Nurse Harris, neither Nurse McAllister nor Ms. Nostrom are entitled to qualified immunity.  Similarly, although Ms. Duke is entitled to summary judgment, genuine issues of material fact preclude summary judgment in favor of or against Nurse McAllister and Ms. Nostrom.

Accordingly, for all the reasons stated above, Plaintiff's Amended Motion for Partial Summary Judgment on Liability[120] is DENIED, Defendant Schryver Medical's Motion for Summary Judgment[121] is GRANTED, and Utah County Defendants' Motion for Summary Judgment[122] is GRANTED IN PART and DENIED IN PART.

SO ORDERED this 13th day of January, 2015.

BY THE COURT:

_____

ROBERT  J. SHELBY
United States District Judge

---

[119] In their reply, Jail Defendants raised the issue of laches.  *See* Dkt. No. 97, at 20-21.  Because this defense was raised for the first time in the reply memorandum and falls well outside the scope of the opposition, it would be inappropriate for the court to address the issue.  DUCivR 7-1(b)(2); *cf. Mitchell v. Kraft Pizza Co.*, 162 F. App'x 801, 804 (10th Cir. 2006).

[120] Dkt. No. 70.

[121] Dkt. No. 77.

[122] Dkt. No. 71.